### NORTHERN ASSUR. CO, Limited, v. DEL MORAL.

(Circuit Court of Appeals, First Circuit. July 18, 1924.)

No. 1654.

1. **Insurance ☞624(5)—Payee of loss as interest may appear necessary party to action on policy.**

   Where by the terms of a policy loss was made payable to a bank, a third party, as its interest might appear, the bank, if it in fact had an interest at the time of loss, is a necessary party to an action on the policy.

2. **Insurance ☞665(4)—Recovery on suspicious loss not aided by presumptions.**

   Where a fire causing loss originated under very suspicious circumstances, the extent of loss should be required to be proved by plain and clearly competent evidence, without the aid of presumptions.

3. **Appeal and error ☞1059(1)—Evidence ☞129(6)—Evidence relating to property other than that insured held incompetent and prejudicial.**

   In action on a policy covering sugar in bags, specifically described as to the number and weight of bags, and brands of sugar, evidence relating to other extensive purchases of sugar by plaintiff stored in the same warehouse was incompetent, and its admission generally prejudicial error, as tending to confuse the issues before the jury.

4. **New trial ☞49—Porto Rica practice of requiring plaintiff to furnish meals to jurors held improper.**

   The practice in Porto Rico of requiring the plaintiff to furnish meals to the jurors during their deliberations, under penalty of having a mistrial declared, the expense to be taxed as costs in case of recovery, *held* improper.

In Error to the District Court of the United States for the District of Porto Rico; Arthur F. Odlin, Judge.

Action at law by Francisco Del Moral against the Northern Assurance Company, Limited. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Carroll G. Walter, of New York City (Edward J. Patterson, of New York City, and J. Henri Brown, of San Juan, Porto Rico, on the brief), for plaintiff in error.

Hugh R. Francis, of San Juan, Porto Rico, for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

300 F.—33

ANDERSON, Circuit Judge. This was a suit on a fire insurance policy to recover for a loss caused by a fire on January 25, 1921. The policy, dated December 18, 1920, ran for three months and was for $35,000. The plaintiff had a verdict and judgment for $30,000.

The chief defenses were:

(1) That the plaintiff actually owned and had stored in the warehouse where the fire occurred sugar of a value less than $8,000.

(2) That the claim was fraudulent, in that the fire was set by the procurement or with the connivance of the plaintiff.

(3) Fraudulent, in that the plaintiff presented a false and padded claim as to the amount of sugar burned or damaged by fire and water.

The case comes here on 43 assignments of error.

[1] A vital, although not on the merits a finally conclusive, point calls for preliminary consideration. In the plaintiff's declaration it is set out that the policy provided, "Loss, if any, payable to the American Colonial Bank of Porto Rico, as interest may appear," and that at the time of the fire the sugar was pledged to said bank to secure an indebtedness of the plaintiff amounting to $7,000. That the policy was so payable is admitted in the answer. There was undisputed evidence that at the time of the trial the bank's interest under the policy was $8,000. It is therefore manifest that the bank was a necessary party. McDowell v. St. Paul F. & M. Ins. Co., 207 N. Y. 482, 485, 101 N. E. 457; North British & Mercantile Ins. Co. v. Rose, 228 Fed. 290, 292, 142 C. C. A. 582; Lewis v. Guardian Fire & Life Ins. Co., 181 N. Y. 392, 397, 398, 74 N. E. 224, 106 Am. St. Rep. 557.

Defendant argues that this error is covered by the forty-third assignment, "that the verdict and judgment are contrary to law." Whether so covered or not, this court should, under the eleventh rule (150 Fed. xxvii), notice so plain an error, even though not assigned. Proper proceedings to avoid this fatal defect as to parties should be taken before another trial on the merits.

The policy covers property described as:

"1,000 bags San Francisco 1st of 110 lbs. per bag,
1,000 bags San Francisco 1st of 150 lbs. per bag,
2,000 bags Constancia 1st of 125 lbs. per bag,
400 bags Constancia 2d of 250 lbs. per bag,
which the insured has in a warehouse, constructed of masonry, with brick roofing and iron doors, situated on Union street, * * * Mayaguez, Porto Rico."

Under section 11 of the conditions is the usual provision that, in case of fire, notice shall be given and proofs of loss with ·requisite vouchers duly submitted within 15 days after the fire. Section 13 provides, in effect, that if a fraudulent claim be presented, or if fraudulent means or documents be used by the insured for the purpose of making any kind of profit through the policy, or if the fire has been caused voluntarily by the insured or with his complicity, the insured shall be deprived of any rights arising out of the policy.

The exceptions and assignments of error largely pertain to the evidence offered in support of the plaintiff's claim as to the amount of sugar in the warehouse and his ownership thereof.

The warehouse belonged to Angel Martinez, brother-in-law of the plaintiff. It was a building 108 feet long, 58 feet wide, and 17 feet high, made of brick, with concrete floor, divided into three aisles by brick columns. The building was not burned, or substantially, if at all, injured, by the fire.

The fire broke out at about 9 o'clock at night, amongst the stacked bags of sugar. There was evidence, uncontradicted, that paper was found thrust in between the bags; that there was a pail of gasoline found in the warehouse; that the bags were stacked horseshoe shape, or in a hollow square, so as to give a deceptive appearance as to the amount of sugar there, and that in the hollows were found barrels with burned paper and other combustibles.

Still more suspicious was the fact that on the day before the fire rumors were so rife in Mayaguez that there was to be a fire in that warehouse that Mr. Todd, representing the American Colonial Bank, which, as above noted, had an interest as pledgee in the sugar and in the policy now sued upon, saw the plaintiff and told him that there was a rumor that there was to be a fire, and that he (Todd) thought Moral ought to take steps to protect himself as well as the bank's interest; that to this the plaintiff replied that he did not believe the story, and thought it was merely propaganda by the enemies of his brother-in-law, Martinez. He assured Mr. Todd that he would take proper steps to look into the matter. While his testimony is that he visited the warehouse between 5 and 6 o'clock that afternoon, it does not appear that he took any precautions to prevent the fire; he went to his house, about a mile away. Martinez was out of town.

One Rodriguez, a member of the firm of agents representing the Yorkshire Insurance Company, which was then carrying policies for Martinez aggregating $35,000 on goods in this warehouse, heard, on January 24, these prophecies, and with one Gomez, representing the Commercial Insurance Company, called on the plaintiff and informed him of them, and that they were disposed to cancel the policies which their companies were then carrying. The plaintiff assured them that they could "go away in peace, that he would be the first one to look out if anything were going to take place, for as far as he knew nothing was going to take place," and "there was not going to be a fire." But the rumors were so persistent that the agent of the Yorkshire Insurance Company canceled $30,000 of the $35,000 insurance which it was then carrying for Martinez, overlooking a $5,000 policy which it was carrying in the name of the plaintiff, although indorsed over to Martinez. As a result of these rumors, the defendant's agent caused a watchman to be stationed at this warehouse. This watchman arrived about 8 o'clock in the evening, and at that time saw no signs of fire. The warehouse doors were closed; it had no windows, but there were air spaces above the doors. About 9 o'clock the prophesied fire broke out, and was disclosed by smoke pouring out of these air spaces. The watchman went for a policeman; on his return he found one of the doors, which was locked from within, open. The fire department was summoned and the contents of the warehouse were drenched for two or three hours. The fire seemed to have broken out in three places in the contents of the warehouse,

mostly sugar and coffee. The water was the main cause of damage. The fire was supposed to be extinguished at about midnight, but it broke out again two or three hours later; this necessitated another drenching.

There was also evidence that on the day before the fire several cartmen were carrying sugar from the warehouse to the station, and that shortly after 6 o'clock on the evening of the fire, when most of the other business establishments were closed, a metal drum, of the kind generally used for gasoline, was taken from a cart into the warehouse through one of the rear doors.

At the time of the fire, on plaintiff's own evidence, the sugar was worth only about one-third of its cost.

[2] Manifestly, the extent of loss arising from a fire originating under such suspicious circumstances should be proved by plain and clearly competent evidence; little, if anything, should be left to the ordinary presumptions. It was not so proved. But the evidence on this vital issue was complicated, confused, and confusing. About 30 of the errors assigned are grounded on exceptions taken to the admission of documents and parol evidence, alleged to bear upon the plaintiff's ownership of sugar in the warehouse at the time of the fire. This evidence took an extraordinarily wide range. Plaintiff was permitted to offer evidence tending (at any rate as was claimed) to show that at the time of the fire he owned in this warehouse 9,455 quintals of sugar, then worth about $61,875, and nearly all destroyed by fire and water.

[3] On what theory of the case it was thought proper to show the plaintiff's purchases and ownership of sugar, outside the sugar covered by the policy, we do not discover. The course of the trial was one calculated to lead the jury away from the real questions before them, which (apart from the plaintiff's alleged connection with the origin of the fire) were:

(1) What amount of sugar, of the kinds and description covered by the policy, did the plaintiff own and have in that warehouse at the time of the fire?

(2) What part of such sugar so owned and located was then destroyed or damaged?

But the plaintiff, instead of attempting to show by direct, clean-cut evidence the purchase, continued ownership, and destruction of the sugar covered by the policy, was permitted to go into the general course of his speculative sugar dealings over a period of about eight months. Plaintiff testified to the effect that, as he was a member of a firm under the articles of copartnership of which he was prohibited from engaging in outside business, he had carried on his sugar transactions through his brother-in-law Martinez. Plaintiff and Martinez were then permitted to offer evidence of large purchases of sugar, mostly in April and May, 1920, all made by Martinez, aggregating nearly $200,000, at prices ranging from about 18 to about 22½ cents per pound. Some of the sugar was, as Martinez testifies, purchased from Centrals, some from one Rosich, which at the time of the purchase was already stored in Martinez' warehouse, where Rosich had his own office or desk. Some, Martinez says, he sold plaintiff directly. The testimony

was that they financed these purchases, in part by moneys borrowed from various banks, secured, at least in part, by pledges of the sugar; that ·checks on such bank accounts were drawn by Martinez as attorney in fact for the plaintiff; that for some purchases Martinez gave checks signed by himself; that other moneys so used were borrowed by the plaintiff from his mother; that other sums were furnished by plaintiff to Martinez in cash. Inferentially at least, Martinez mingled his own funds with those of the plaintiff, and vice versa. There was some evidence, at least by inference, of sales during the summer of 1920; also of partial releases by the banks of their security on the sugar purchased. It seems fairly clear that a large part of the original bank loans were paid off from funds derived either from sales or not otherwise satisfactorily accounted for. The plaintiff testified that he kept no books of record of these purchases of sugar— "only the invoices." Martinez also said that all through 1920 he bought and sold sugar on his own account and kept the sugar in the same warehouse, and that at the time of the fire he had sugar of his own in the warehouse, insured for $35,000 in the Yorkshire Insurance Company; that he was plaintiff in a suit against the Yorkshire Company to recover for a loss at this fire, "but I do not recall how much sugar I had at that time, even approximately."

Attached to the defendant's sworn proof of loss was the following:

### Details of the Indemnity.

| Amount. | Description of Destroyed or Damaged Property. | Constancia Sugar. | | | Value at Time of Fire. | Indemnity Demanded. |
|---|---|---|---|---|---|---|
| 500 bags of | centrifugal | 126.250 lbs. | at | $6. | $7,575. | $7,575. |
| 200 " " | crystallized | 50,500 " | " | 5. | 2,525. | 2,525. |
| 400 " " | " | 101,000 " | " | 5. | 5,050. | 5,050. |
| 500 " " | Constancia | 62,500 " | " | 7. | 4,375. | 4,375. |
| 600 " " | clear | 150,000 " | " | | 9,000. | 9,000. |
| 488 " " | first class | 61,000 " | " | 7. | 4,270. | 4,270. |
| 1050 " " | second | 131,250 " | " | 7. | 9,187.50 | 9,187.50 |

San Francisco Sugar.

| 560 bags of | No. 1 | 61,600 lbs. | at | 8. | 4,928. | 4,928. |
|---|---|---|---|---|---|---|
| 540 " " | No. 2 | 81,000 " | " | 7¼ | 5,872.50 | 5,872.50 |
| 160 " " | clear | 24,000 " | " | 7¼ | 1,740. | 1,740. |
| 40 " " | white | 4,400 " | " | 8. | 352. | 352. |
| 160 " " | clear | 24,000 " | " | 7¼ | 1,740. | 1,740. |
| 160 " " | clear | 24,000 " | " | 7¼ | 1,740. | 1,740. |
| 40 " " | white | 4,400 " | " | 8. | 352. | 352. |
| 180 " " | white | 19,800 " | " | 8. | 1,584. | 1,584. |
| 180 " " | white | 19,800 " | " | 8. | 1,584. | 1,584. |
| | | | | | $61,875.00 | $61,875.00 |

Salvaged Sugar, Weight is More or Less.

| 239 bags of | without mark | 27,655 lbs. | |
|---|---|---|---|
| 96 " " | San Francisco No. 2. | 14,000 " | Subject to appraisal |
| 574 " " | Constancia | 71,400 " | of experts. |
| 78 " " | Mercedita | 19,750 " | |
| 987 | Total | 133,305 lbs. | |

Clearly, the plaintiff's rights were limited to the sugar covered by the policy, and to the corresponding items set forth in this proof of loss. The first step is to compare a description of the sugar in the policy with that in the "Details of the Indemnity." The policy covers "1,000 bags San Francisco 1st of 110 pounds per bag, and 1,000 bags San Francisco 1st of 150 pounds per bag." Turning to the "Details of the Indemnity," we find no "San Francisco 1st" or its equivalent "No. 1," except 560 bags, valued at $4,928. Evidence as to ownership and loss of "San Francisco No. 2," "clear," or "white," was not admissible to show liability under the policy.

As to Constancia, the policy covers "2,000 bags Constancia 1st of 125 pounds per bag, and 400 bags Constancia 2d of 250 pounds per bag." The "Details of the Indemnity" show "488 bags Constancia first class" (which we construe as being the equivalent of "1st"), of 125 pounds per bag, valued at $4,270. While the policy covers 400 bags of Constancia 2d of 250 pounds per bag, the "Details of the Indemnity" refer to "1,050 bags of Constancia second," in 125-pound bags, for 131,250 pounds in 1,050 bags figures 125 pounds per bag. There was no attempt to show that the sugar described in the policy as "400 bags Constancia 2d of 250 lbs. per bag" was included in this item of "1,050 bags of Constancia 2d," though in 125-pound bags. The statement of the weight per bag seems to have been treated as an essential part of the description of the sugar covered by the policy. The result is that the only sugar covered by the policy and by the proof of loss (both) is the 560 bags of San Francisco No. 1, valued at $4,928, and 488 bags Constancia 1st, valued at $4,270, an aggregate of $9,198. This amount may be reduced by the salvage; for, on this record, we cannot know whether any part of the salvaged "574 bags of Constancia" should be applied to the "488 bags of Constancia 1st" or not.

We see, on this record, no escape from the conclusion that the plaintiff's rights under the policy and the proof of claim were limited to showing ownership and location in that warehouse of these two quantities of 560 bags of San Francisco 1st and 488 bags of Constancia 1st.

The gist of this part of the case was not the *value* of the sugar in the warehouse, or the gross amount of sugar destroyed or damaged by the fire, but the *identity* of the sugar destroyed or damaged with that covered by the policy and claimed under the sworn proof of loss. The burden was, of course, upon the plaintiff to establish this identity of legal ownership, location, and destruction by a fair preponderance of evidence.

We find in the record and in the brief of plaintiff's counsel no evidence or even claim that any of the sugar described in the policy as "San Franscisco 1st" and "Constancia 1st and 2d" was otherwise described (but actually covered) in the proof of loss. So far as appears, the description in the policy is complete in itself, and exclusive of sugar otherwise named or described in the proof of loss.

This evidence—admitted generally, without limitations, and against numerous exceptions—fairly warrants the argument of the defendant's learned counsel as follows:

"In short, the plaintiff was permitted to offer evidence of all his alleged purchases, entirely regardless of whether the sugar purchased was the sugar described in the policy or not. He was thus enabled to get before the jury a large mass of documents and testimony indicating very large purchases, and the natural result was that the jury did not discriminate between what was and what was not covered by the particular policy sued on. This was highly prejudicial and most indisputably influenced the verdict.  *  *  *

"A conglomerate mass of documents and testimony was introduced, without any attempt to tell the jury that they were not to consider either whole or any specific part of that mass, and no attempt was made to tell them what was proper and what was not."

While we can now see no reason why the case should not at a new trial be brought within the narrow limits above indicated, yet if, because of the application of the coinsurance clause, the trial court should be of the opinion that the trial must take a broader range, then the case is not one fit for the primary consideration of a jury. It should be sent to an auditor. Compare Ex parte Peterson, 253 U. S. 300, 40 Sup. Ct. 543, 64 L. Ed. 919; Houlihan v. Corporation of St. Anthony (C. C.) 173 Fed. 496, s. c., 184 Fed. 252, 106 C. C. A. 394; Primrose v. Fenno (C. C.) 113 Fed. 375; Id., 119 Fed. 801, 56 C. C. A. 313; Vermeule v. Reilly (D. C.) 195 Fed. 226; United States v. Wells (D. C.) 203 Fed. 146.

As this case now appears, the coinsurance clause has no application. True, there was another insurance policy of $25,000 covering sugar in this warehouse, which the plaintiff had for "his own account and/or the account of others for which he may be responsible." But in the judge's charge we find nothing as to this other insurance, or as to any application of the coinsurance clause. Apparently this clause had nothing to do with this case. At any rate, evidence of the ownership, location, and destruction of sugar not covered by the policy (if admissible at all, which we do not intimate) must be admissible only for some carefully limited and clearly defined purpose. The jury must not be allowed to hold this defendant for a loss on sugar not covered by its policy.

[4] Our conclusion that there must be a new trial makes it unnecessary to consider in detail most of the assignments of error. One other point calls for brief consideration, in the interest of sound practice. There was a motion for a new trial, grounded in part upon the contention that the jury were improperly furnished with meals at the expense of the plaintiff. We agree with the court below that, as there was nothing in the affidavits supporting the motion showing that the jury knew of the manner in which the meals furnished were paid for, the verdict should not on that account be upset. But in dealing with the motion the court said:

"*  *  *  In a civil case tried before a jury the rule in this court is that plaintiff has the option of advancing or becoming responsible for the meals of the jury or consenting that the court declare a mistrial.  *  *  *  Inasmuch as the plaintiff is responsible for bringing the suit and forces the defendant to a trial before a jury, which the latter does not desire, the just and proper course, as it seems to me. is to require the plaintiff to provide the funds needed to furnish reasonable meals to the jurors, and the expenses of these meals the plaintiff will thereafter recover from the defendant if the former shall prevail, but he will lose this money if he fails to obtain a verdict."

"Such is the custom in Porto Rico. I do not feel that I should abolish this custom, unless the Court of Appeals at Boston shall determine this ruling to be improper."

We assume that in the first part of the foregoing quotation the court uses the word "rule" as meaning "custom," or "practice," for we find no rule of that court requiring the plaintiff to become responsible for the meals of the jury under penalty of a mistrial. We think that the custom or practice is improper. We can discern no ground upon which the court has legal power to deprive a plaintiff of his full right of jury trial, unless both able and willing to pay or become responsible for the meals of the jury during deliberation. Nor do we know of any statute under which the expenses of such meals may be taxed as costs against the losing party.

We apprehend that, as matter of strict law, a jury during deliberation are required to pay for their own meals, as they are during the trial. Jurymen are entitled to their mileage and fees, and to no other compensation.

There are obvious practical advantages in furnishing the jury reasonable (of course, not extravagant) meals during deliberation. But any arrangements in that regard must rest on agreement or extralegal custom. It cannot be extended to cut down the legal or constitutional rights of the parties litigant. While, when meals are furnished at public expense, as in the Massachusetts state courts, juries sometimes appear to delay decision in order to feed at the public expense, the weight of argument is probably in favor of that method. But when, as seems to be the case both in Porto Rico and in the federal courts of the United States, there is no statutory provision by which in civil cases the jury can during deliberation be furnished meals at government expense, the practice obtaining in this district is certainly less objectionable than the custom stated to prevail in Porto Rico. In this district, in the Southern district for New York, and very likely elsewhere, under long-time custom, such meals are furnished at joint expense of plaintiff and defendant, and not taxed as costs against either party. This practice, even if otherwise objectionable, is certainly not open to the objection that the jury may regard themselves as the recipients of favors from one side or the other. Of course, if the parties agree that the prevailing party shall have his share taxed as costs, this would be unobjectionable.

The other assignments of error do not involve points sufficiently likely to arise on a new trial, so as to make it necessary for us now to discuss and determine them.

The judgment of the District Court is reversed, the verdict is set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion; the plaintiff in error recovers costs in this court.